# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS ABBRUZZESE, et al.,<br><br>Defendants. | CASE NO. 2:24-cv-1717-JNW<br><br>ORDER DENYING VALVE'S MOTION FOR PRELIMINARY INJUNCTION |

## 1. INTRODUCTION

This matter comes before the Court on Plaintiff Valve Corporation's motion for a preliminary injunction. Dkt. No. 79. Defendants are hundreds of users of Valve's Steam video-game platform, each of whom brought claims in arbitration against the company as required by Valve's Steam Subscriber Agreement. While those claims were pending, Valve amended the agreement to require those disputes to proceed in court instead, and now asks the Court to halt the arbitrations on the ground that the amended agreement governs. The motion is fully briefed, and the Court heard oral argument on May 19, 2026.

Having considered the parties' submissions, the record, and the argument of counsel, the Court concludes that Valve has not carried the burden a preliminary injunction requires. The agreement Valve relies on cannot do the work Valve asks of it because the retroactive forum selection clause that would pull these pending arbitrations into court is unenforceable as applied to these Defendants. The motion is DENIED.

## 2. BACKGROUND[1]

### 2.1 Valve's Steam Subscriber Agreement required arbitration.

Valve owns and operates Steam, an online platform on which consumers buy, download, and play video games. Dkt. No. 80 ¶ 2. To create a Steam account, a user must agree to the Steam Subscriber Agreement, or SSA. *Id.* ¶ 3. Valve drafted the SSA and presents it to users as written—users do not negotiate its terms. *See id.*

In 2012, Valve added an arbitration agreement to the SSA, requiring users to "resolve all disputes and claims between us in individual binding arbitration" with the American Arbitration Association (AAA). *Id.* ¶ 5. The most recent version of the SSA containing this arbitration agreement went into effect on April 25, 2023, and is referred to in this Order as the "Original SSA." *Id.*; Dkt. No. 80-1.

Section 8 of the Original SSA addressed modifications to the agreement. It stated, "[t]his Agreement may at any time be mutually amended by your explicit

[1] The parties think little of each other, and they say so at length in their papers. Each accuses the other of bad faith. That back-and-forth has not helped the Court, and it does not drive the decision. The facts below come from the record and from counsel's representations at the preliminary injunction hearing. The Court notes the parties' disagreements where they matter.

consent to changes proposed by Valve." Dkt. No. 80-1 § 8.A. Section 8.B added that Valve may amend the SSA "unilaterally at any time in its sole discretion," subject to a thirty-day notice requirement, and that the user's "failure to cancel [their] Account prior to the effective date of the amendment will constitute [their] acceptance of the amended terms." *Id.* § 8.B. For users who didn't agree to an amendment, their "only remedy" was "to cancel" their account or "cease use" of the service. *Id.*

### 2.2 Steam users brought their claims to arbitration.

In 2021, a video game publisher and two Steam users sued Valve, alleging that Valve uses its market power and anticompetitive practices to unlawfully inflate prices on games sold and distributed through Steam. *Wolfire Games, LLC v. Valve Corp.*, No. 2:21-cv-00563-JCC (W.D. Wash. filed Apr. 27, 2021).[2] Valve moved to compel arbitration under the Original SSA, and the Honorable John C. Coughenour granted the motion, ordering the consumer plaintiffs—Steam users—and Valve to arbitration. *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2021 WL 4952220, at *1 (W.D. Wash. Oct. 25, 2021).

Beginning in October 2023, individual Steam users, represented by Bucher Law PLLC, filed arbitration demands against Valve before the AAA, asserting Sherman Act and Washington Consumer Protection Act claims. Dkt. No. 81 ¶ 4. The first set of demands numbered 997; thousands more followed in November and

[2] In 2022, the Court consolidated that case with related actions and recaptioned the consolidated proceeding *In re Valve Antitrust Litigation*. The parties and this Order refer to the consolidated proceeding as *Wolfire*, after its lead case.

December 2023. *Id.* ¶¶ 4–5. At last count, 4,991 claimants were pursuing arbitration against Valve before the AAA. *Id.* ¶ 6. The 572 Defendants in this action are among those claimants. *Id.* ¶¶ 7–8; Dkt. No. 81-3.

On May 22, 2024, four of the twenty-five claimants then before Arbitrator Jeffrey Dasteel, through Bucher Law, moved to dismiss their own arbitrations, arguing that the Original SSA's arbitration agreement was unenforceable. Dkt. No. 81 ¶¶ 9–10. On July 8, 2024, Arbitrator Dasteel granted the motions, held the arbitration agreement unenforceable, and dismissed the four arbitrations so that the claims could be pursued in court.[3] *Id.* ¶¶ 11–12; Dkt. No. 78 ¶¶ 83–84. Those four claimants are not Defendants in this action; they became named plaintiffs in a putative class action against Valve, *Elliott v. Valve Corp.*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024), which this Court later consolidated into the *Wolfire* proceedings. Dkt. No. 81 ¶¶ 13, 16–17; Dkt. No. 78 ¶¶ 84–85. Valve did not move to vacate Arbitrator Dasteel's orders. Dkt. No. 81 ¶ 15; Dkt. No. 78 ¶¶ 87–88.

### 2.3 Valve removed the arbitration clause from the Steam Subscriber Agreement.

On September 26, 2024—about three months after Dasteel's ruling—Valve removed the arbitration clause and class action waiver from the SSA. Dkt. No. 80 ¶ 6. Valve asserts that it removed the clause in response to the arbitrator's unenforceability finding. Dkt. No. 79 at 12. Valve published an updated version

[3] The Dasteel order itself is not in the record before the Court; its substance is described in a subsequent arbitral ruling that characterizes Arbitrator Dasteel's orders as "unconscionability rulings" and recites that he held the arbitration agreement was "unconscionable." Dkt. No. 95-2 at 23, 36.

("Updated SSA") containing a retroactive forum-selection clause requiring that "all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) . . . be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." Dkt. No. 80-2 § 10. The Updated SSA also contains a merger clause stating that it supersedes the parties' prior agreement. *Id.* § 11.

Valve gave Steam users notice of the amendment in three ways. Dkt. No. 80 ¶ 9. First, between September 26 and 27, 2024, Valve sent an Email Notice to the email address associated with each Steam user account:



**Hello**

**We have updated the Steam Subscriber Agreement**

We've updated the Steam Subscriber Agreement. The updates affect your legal rights. They include changes to how disputes and claims between you and Valve are resolved. The updated dispute resolution provisions are in Section 10 and require all claims and disputes to proceed in court and not in arbitration. We've also removed the class action waiver and cost and fee-shifting provisions. Please carefully review the updated Steam Subscriber Agreement here.

This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make most purchases, fund your Steam wallet, or otherwise accept it. Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then. If you would like to delete your Steam account, you can learn more about account deletion here.

This notification has been sent to the email address associated with your Steam account.

Dkt. No. 80 ¶¶ 10–11, 23.

Second, beginning September 26, 2024, Valve displayed a Pop-Up Notice on the Steam client, which presented a check box labeled, “I Agree to the Updated Steam Subscriber Agreement” and an “Accept Updated SSA” button:




*Id.* ¶ 12. The Pop-Up Notice contained no “decline” check box or button, but Steam users could close the notice without accepting by clicking the small “X” in the upper-right corner of the pop-up. *Id.* ¶¶ 13–15.

Third, also beginning September 26, 2024, Valve published a Blog Post on the Steam platform announcing the change and linking to the Updated SSA:




*Id.* ¶¶ 16–17.

Each of these notices linked to the Updated SSA itself, which Valve posted on a public-facing page on the Steam website, available continuously from September 26, 2024, in ten languages. *Id.* ¶¶ 7–8. At the top of that page, set apart in a red-outlined box, a banner announced that the agreement had been updated and that, "[a]mong other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration":




*Id.* ¶ 7.

Separately, beginning September 26, 2024, Valve required users to accept the Updated SSA before buying games. *Id.* ¶ 19. When a user made a purchase or funded a Steam Wallet, Valve presented a check box, hyperlinked to the Steam Subscriber Agreement, that the user had to check before clicking "Purchase" or "Add Funds":




*Id.* ¶¶ 20–21.

The Email Notice and Pop-Up Notice each stated that the Updated SSA would become effective on November 1, 2024, "unless you delete or discontinue use of your Steam account before then." *Id.* ¶¶ 10, 12. The Email Notice included a link with information on how to delete a Steam account. *Id.* Under the SSA, canceling an account does not entitle the user to any refund of subscription fees, and a

terminated subscription's activation key cannot be registered to another account. Dkt. No. 80-2 § 9.B. Thus, deleting a Steam account forfeits the user's purchased game library. *See* Dkt. No. 95 ¶ 4. Defendants claim their Steam libraries average more than $3,000 in purchased content. *Id*. Valve disputes that figure as unsupported by any Defendant's own evidence. Valve further contends that rejecting the Updated SSA did not require forfeiting any purchased games: in Valve's view, a user could decline the Updated SSA and retain the licenses to games already purchased by discontinuing use of the account rather than deleting it. Dkt. No. 106 at 11–12.

According to Valve, of the 572 Defendants, 454 affirmatively accepted the Updated SSA before November 1, 2024, by checking the Pop-Up Notice box, by clicking the purchase-screen acceptance, or both. Dkt. No. 80 ¶ 24. The remaining 118 did not affirmatively accept, but each logged into Steam on or after November 1, 2024. *Id.* ¶¶ 25–27. None of the 572 deleted their Steam accounts before November 1, 2024. *Id.* ¶ 26.

### 2.4 The arbitrations went forward.

On September 27, 2024, the day after it amended the SSA, Valve asked the AAA to administratively close the pending arbitrations for lack of jurisdiction. Dkt. No. 81 ¶ 21; Dkt. No. 81-4 at 2. The AAA declined, stating that issues of arbitrability and disputes over the applicable contract should be addressed by a court or the merits arbitrators. *Id.* ¶¶ 23–24; Dkt. No. 81-2 (AAA Oct. 7, 2024, Letter).

Defendants' evidence is that eleven arbitrators have ruled that the Original SSA controls and that Valve's amendment does not displace it. Dkt. No. 95 ¶¶ 3, 11; Dkt. No. 95-2 (orders of Arbitrators Saydah (Oct. 11, 2024), Badal (Oct. 9, 2024), Gaglione (Apr. 17, 2025), Gilman (Oct. 9, 2024), Kingsley (Oct. 20, 2024), Morrill (Nov. 19, 2024), Goins (Oct. 24, 2024), Jossen (Mar. 17, 2025), Sperow (Nov. 13, 2024), Ohashi (Nov. 22, 2024), and Samas (Sept. 9, 2025)). Valve characterizes the arbitral record differently. It states that most merits arbitrators stayed proceedings in deference to this Court rather than ruling that the arbitrations may proceed, that 224 arbitrations were stayed as of August 2025, and that the AAA later disqualified Arbitrator Sperow, whose replacement declined to follow her ruling. Dkt. No. 81 ¶¶ 29, 45; Dkt. No. 106 at 9.

Valve has continued to participate in the pending arbitrations under a reservation of rights. Dkt. No. 81 ¶ 51. As of the briefing on this motion, many arbitrations were moving toward final merits hearings, a number had been completed, and some had produced awards. *Id.* ¶ 45; *see also* Dkt. No. 95 ¶ 7. By the time of oral argument, the parties represented that many Defendants had completed merits hearings. These arbitrations have produced mixed results—some have ended in awards for Valve, which Valve has petitioned the King County Superior Court to confirm and which that court has confirmed, Dkt. No. 81 ¶¶ 45–48; Dkt. Nos. 81-5, 81-6; Dkt. No. 78 at 13 n.9, others have produced rulings and

awards in claimants' favor, at least one of them substantial, Dkt. No. 95 ¶ 10; Dkt. No. 81 ¶ 50.[4]

### 2.5 Valve then sued.

When the AAA declined to close the arbitrations, Valve turned to this Court. It filed this action on October 18, 2024, as a petition to enjoin the arbitrations, naming 624 respondents. Dkt. No. 1; Dkt. No. 76 at 3. The Court struck the petition as improperly filed and directed Valve to file a civil complaint. Dkt. No. 76. Valve filed its complaint on August 21, 2025, naming 572 Defendants. Dkt. No. 78.

Valve moved for a preliminary injunction on August 21, 2025. Dkt. No. 79. Defendants responded. Dkt. No. 92. The parties filed supplemental briefing and notices of new authority. Dkt. Nos. 106, 125-1, 128, 130, 132, 135. The Court held oral argument on May 19, 2026.

As Defendants' arbitrations have been completed, withdrawn, or otherwise resolved, the number of Defendants has fallen over the course of the litigation. At oral argument, Valve represented that, of the 572 Defendants named in the complaint, roughly four hundred remained active. Defendants did not agree to a specific figure and stated that they could not provide an exact count, in part because some who had withdrawn from arbitration continued to assert rights in this action.

---

[4] Among the awards in claimants' favor are interim awards in several arbitrations, partially in the claimant's favor and partially in Valve's favor, which Valve has petitioned this Court to vacate on the ground that there was no agreement to arbitrate. Dkt. No. 81 ¶ 50; Dkt. No. 106 at 17 n.14. The claimants who received final awards in Valve's favor are not Defendants in this action. Dkt. No. 81 ¶ 46.

## 3. DISCUSSION

Stripped to its core, this motion turns on one question: which version of the parties' agreement governs disputes that were already in arbitration when Valve rewrote it. Valve says the new version controls, takes the disputes out of arbitration, and sends everyone back to court. The Court concludes that Valve is unlikely to succeed on the merits of this argument, and so cannot obtain the extraordinary relief it seeks.

The reason lies in how these disputes reached arbitration in the first place. Valve wrote the contract that put them there. For years it required its customers to arbitrate, and it went to federal court to make them do so. Thousands complied, spending time and money to litigate in the forum Valve had chosen. Only after those proceedings were well underway did Valve change the contract to route the same disputes into court. A party may ordinarily amend a contract that, by its own terms, allows for amendment. But the law does not let a party—let alone the drafter—use the amendment power to strip away rights its customers have already exercised. The forum selection clause that Valve now invokes—applied backward, to claims already pending—is unconscionable as Washington uses that word; that is, one-sided in how it operates, and offering nothing to the people it binds.

### 3.1 The Court has subject-matter jurisdiction.

A federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The Court addressed the question when it struck Valve's petition and directed Valve to proceed by complaint, Dkt. No.

76 at 4–7, and it reaffirms its conclusion here—the Court has federal-question jurisdiction under 28 U.S.C. § 1331. The reasoning, explained in the Court's prior Order, is straightforward. Neither the Declaratory Judgment Act nor the FAA confers jurisdiction of its own. *Medtronic, Inc. v. Mirowski Fam. Ventures*, LLC, 571 U.S. 191, 197 (2014); *Badgerow v. Walters*, 596 U.S. 1, 7–8 (2022). The Court instead looks to the coercive action Defendants could bring—a motion to compel arbitration under Section 4 of the FAA—and through that motion to the underlying controversy. *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 799 F.2d 1312, 1315 (9th Cir. 1986); *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009). That controversy is the Defendants' Sherman Act claims, which arise under federal law. 15 U.S.C. §§ 1–2; 28 U.S.C. § 1331. The Court would have jurisdiction over a motion to compel arbitration of those claims, and so has jurisdiction over Valve's action seeking the opposite.

Defendants argue to the contrary, contending that no live controversy exists because Valve continues to participate in the arbitrations, making this a request for an advisory opinion. Dkt. No. 92 at 29–30. But Valve participates under protest and a reservation of rights, maintaining that no agreement to arbitrate exists. That is not the same as conceding that nothing is in dispute. The controversy is live.

Defendants also argue that the FAA does not allow a court to enjoin a pending arbitration. *Id.* at 28–29. But the power to grant injunctive relief is an ordinary attribute of a court with jurisdiction over the case, and Defendants identify no authority holding that a court with subject-matter jurisdiction lacks the power to enjoin an arbitration. *Cf. Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 749

(9th Cir. 2014) (remanding for the district court to apply the remaining *Winter* factors in deciding whether to enjoin a FINRA arbitration). The question is not whether the Court may grant the relief Valve seeks, but whether Valve has shown that it should. The Court turns to that question.

**3.2 The ordinary preliminary-injunction standard governs.**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain one, the moving party must demonstrate that: "(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation modified). The first factor—likelihood of success—is the most important.[5] *Id.*

Defendants contend that a heightened standard applies because Valve seeks a *mandatory* injunction—one that, in their view, would disturb the status quo rather than preserve it. Dkt. No. 92 at 20. The line between mandatory and prohibitory injunctions is easier to state than to apply, and the Ninth Circuit has

[5] "Alternatively, a preliminary injunction may issue where serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor if the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (citation modified). Valve gestures at this "sliding scale" approach in its opening brief, Dkt. No. 79 at 15, but neither party seriously invokes it, and it does not change the outcome here. As explained below, Valve has not raised serious questions on the merits, identified any irreparable harm, or shown that the equities tip in its favor—let alone sharply—so there is no strong showing on any factor for a weaker one to offset.

called the distinction "controversial." *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). But the line here is clear.

"A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation modified). A mandatory injunction "orders the responsible party to take action pending the determination of the case on its merits." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). They "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (citation modified).

Valve asks the Court to order the Defendants to stop arbitrating—to "desist from arbitrating their claims while this Court determines" which agreement governs. Dkt. No. 106 at 7. An order directing a party to refrain from acting is a "quintessential prohibitory injunction." *Doe*, 28 F.4th at 111; *see also Hernandez*, 872 F.3d at 998 (an injunction preventing future violations is "a classic form of prohibitory injunction"). Defendants resist that characterization, contending that an order halting hundreds of ongoing arbitrations is mandatory because it does not preserve the status quo. But the label turns on what the order directs the enjoined party to do, and this order would direct Defendants to *stop*—to halt conduct, not to undertake it. *Cf. Doe*, 28 F.4th at 111 (injunction compelling a state Medicaid director to fund and evaluate coverage for gender-affirming surgery was mandatory); *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994)

(injunction reinstating a terminated coach was mandatory, not prohibitory). That the conduct here is well under way does not convert a prohibition into a command.

The Court thus applies the ordinary *Winter* standard, without the heightened showing reserved for mandatory relief.

**3.3 Valve has not shown a likelihood of success on the merits.**

Valve's claim is for a declaratory judgment that the Updated SSA supersedes the Original SSA and ends the pending arbitrations. To obtain a preliminary injunction, Valve must show it is likely to prevail on that claim. It cannot.

Arbitration is "a matter of contract" and "strictly a matter of consent." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147–48 (2024) (citation modified).[6] Whether a valid agreement exists, and what it requires, is governed by ordinary state-law principles of contract formation. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). The parties agree that, at least for purposes of analyzing the pending motion, Washington law controls. Dkt. No. 92 at 23 n.3.

That an arbitration agreement is only a contract is the premise of Valve's motion, and it is also its undoing here. Washington contract law binds the party that drafts the form no less than the party that signs it, and mutual assent to a

[6] Valve invokes *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024), for the point that this Court, not the arbitrators, decides which of two competing contracts governs. *Id*. at 151 (where parties have agreed to two contracts, one sending arbitrability disputes to arbitration and the other to the courts, "a court must decide which contract governs"). The point is well taken, and Defendants do not seriously contest it; their arguments about Coinbase—that it is factually distinguishable, or that Valve's reliance on it amounts to a "do-over" of the order compelling arbitration in *Wolfire*—go to the merits and the procedural posture, not to who decides which contract controls.

form cannot cure terms that are otherwise unenforceable. As explained below, Valve can likely establish that Defendants assented to the Updated SSA and that the document, by its terms, reaches the pending arbitrations. But the retroactive forum clause it now invokes is unconscionable as applied to these Defendants, and an unconscionable term is unenforceable.

#### 3.3.1 Defendants likely assented to the Updated SSA, but that does not end the inquiry.

Valve's evidence on assent divides the original Defendants into two groups. *See* Dkt. No. 80 ¶¶ 24–28. The first group (454 Defendants) affirmatively accepted the Updated SSA through the Pop-Up Notice, the purchase-screen check box, or both. *Id.* ¶ 24. The second group (118 Defendants) did not affirmatively accept but logged into Steam on or after November 1, 2024, the amendment's effective date. *Id.* ¶¶ 25–27.

As to the first group, Valve has likely shown assent. Under Washington law, "a contract is formed when mutual assent exists, which generally consists of offer and acceptance." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (citing *Weiss v. Lonnquist*, 224 P.3d 787, 792 (Wash. Ct. App. 2009)); *see also Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 491 (Wash. 2020) ("It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time."). In the online context, mutual assent "turns on whether the consumer had reasonable notice of the terms[.]" *Wilson*, 944 F.3d at 1219. A clickwrap agreement—one that presents the terms and requires the user to click an "I agree" box to proceed—is enforceable where the notice was "reasonably

conspicuous" and the user took an action "unambiguously manifest[ing]" assent. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022).[7]

The Pop-Up Notice and the purchase-screen check box are conventional clickwrap mechanisms of that kind, and Defendants do not challenge the conspicuousness of the notice or the clarity of the assent it required. On this record, Valve has likely shown that the 454 affirmative-acceptance Defendants assented to the Updated SSA. The 118 continued-use Defendants present a harder question, but the Court need not resolve it: the grounds set out below defeat Valve's claim as to every Defendant, however the continued-use group is treated.

Assent likely established, the next textual step is supersession. The Updated SSA provides that "all disputes and claims," including "any dispute or claim that arose before the existence of this or any prior agreement," must "be commenced and maintained exclusively" in court, Dkt. No. 80-2 § 10, and that it "supersedes any prior oral or written agreements," *id.* § 11. Read literally, those terms purport to pull the pending arbitrations into court. So Valve has likely shown both assent to the document and that the document, on its face, reaches the pending arbitrations.

That is where Valve's likelihood of success ends, not where it is secured. A term is not enforceable merely because a party assented to the form that contains it. *See Burnett*, 470 P.3d at 495–96 (formation and the meaningful-choice inquiry are distinct; an assented-to term may still be unconscionable). The remaining

---

[7] While *Berman* analyzed New York and California law, the Ninth Circuit has "consistently stated that no differences exist in the law of the different states as to internet contract formation." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025).

question—whether the retroactive forum clause is enforceable or instead unconscionable, as applied to these Defendants—is not answered by the click of a button. The Court turns to that question next.

#### 3.3.2 The Updated SSA is likely procedurally unconscionable.

Washington recognizes both *procedural* and *substantive* unconscionability. Procedural unconscionability turns on "all the circumstances surrounding the transaction including, the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print." *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 759 (Wash. 2004) (citation modified). The inquiry is not just about notice—it's about whether there is a "lack of meaningful choice." *Id.; Burnett*, 470 P.3d at 495 ("The key inquiry is whether the party lacked meaningful choice."). Several features of Valve's amendment process, taken together, foreclose meaningful choice as applied to the pending arbitrations.

Begin with the contract itself, which is, and has always been, a contract of adhesion. Under Washington law, an adhesion contract is (1) "a standard form printed contract," (2) "'prepared by one party and submitted to the other on a 'take it or leave it' basis," and (3) marked by "'no true equality of bargaining power' between the parties." *Zuver,* 103 P.3d at 760 (quoting *Yakima County (W.Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 858 P.2d 245 (Wash. 1993)). The SSA satisfies each element. Valve drafted it as a standard form; Steam users cannot negotiate its terms; and there is no alternative to accepting it if one wishes to

maintain a Steam account. The disparity in bargaining power between Valve and an individual consumer could hardly be greater. Standing alone, neither the SSA's adhesive character nor the bargaining-power imbalance would establish procedural unconscionability, *see Adler v. Fred Lind Manor*, 103 P.3d 773, 783–84 (Wash. 2004), but these features do not stand alone here. Rather, they provide the backdrop against which Valve presented the choice that follows—and that choice was no meaningful choice at all.

What appears to foreclose meaningful choice is the structure of the rejection mechanism Valve drafted. Its terms do not even speak with one voice about how to reject the Updated SSA. Section 8.B's operative sentence frames cancellation as the way to avoid acceptance: "your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms." Dkt. No. 80-1 § 8.B. Valve's notices, meanwhile, told users they could avoid the new terms either by deleting the account or by "discontinu[ing] use" of it before the November 1, 2024, effective date. Dkt. No. 80 ¶¶ 10, 12. A consumer trying to decline thus had to navigate at least some uncertainty about what declining required, and under Washington law, any residual ambiguity in the rejection terms is construed against the drafter. *Adler*, 103 P.3d at 786.

But the deeper problem is not so much the wording of the rejection mechanism as it is that every route the notice offered came with the same price. To reject the Updated SSA, the consumer had to abandon the only tangible benefit offered to her by Valve: access to her Steam account and the game license(s) she had already bought. Deleting the account forfeited her purchased games—worth, on

Defendants' evidence, an average of more than $3,000—with no refund and no transfer of the licenses. Dkt. No. 95 ¶ 4; Dkt. No. 80-2 § 9.B. Though perhaps less final, discontinuing use came to the same thing, since to reject the new forum, she had to stop using the library she had paid to keep. Anything short of deletion or discontinuance was deemed acceptance. Dkt. No. 80 ¶¶ 25–27. That is the forced election the meaningful-choice doctrine condemns. A consumer could keep the benefit of her purchases or keep the right to arbitrate, but not both.

Valve resists this by propping up Ryan Lally—an original *Wolfire* plaintiff, though not a Defendant here—who, Valve says, rejected the Updated SSA by ceasing use of his account and so kept his right to arbitrate under the prior agreement. Dkt. No. 106 at 10–11. But Lally proves the point rather than refutes it. To preserve that right, he had to stop using the library he had paid for, and never use it again, since any login after *November 1, 2024*, counted as acceptance. That is the forced election just described, not an escape from it. Nor does one claimant's willingness to pay that price establish meaningful choice for everyone else. Lally was a named plaintiff in the underlying litigation, as informed as a consumer could be—unlike the many Defendants bound merely by logging in, who never saw the terms. Meaningful choice is measured by the ordinary user, not the most sophisticated litigant. *See, e.g.*, *Tadych v. Noble Ridge Constr., Inc.*, 519 P.3d 199, 204 (Wash. 2022) (in assessing unconscionability, the court considers "factors such as the expertise or sophistication of the parties"); *Torgerson v. One Lincoln Tower, LLC*, 210 P.3d 318, 323 (Wash. 2009), *as corrected* (July 16, 2009) (no unconscionability where real estate agents "could hardly be said to have lacked a

meaningful choice" in condominium purchase due, in part, to their expertise and sophistication in the field).

Compounding all of this is the way Valve went about getting the consumer's assent. Many Defendants were not unrepresented strangers to Valve. They were adverse parties in active arbitrations, with lawyers of record, litigating against Valve at the very moment Valve rewrote the contract. A litigant who wants something from an opposing party who has counsel asks the lawyer. Valve did the opposite. It drafted an amendment designed to end those proceedings and pushed it past the lawyers, onto the screens of the consumers themselves, with a single button marked "Agree." Other courts have rejected this maneuver. The Eleventh and Sixth Circuits, for example, have both refused to enforce a litigation-ending arbitration amendment that a drafter routed around opposing counsel and onto a represented adversary mid-suit. *Dasher v. RBC Bank (USA)*, 882 F.3d 1017, 1021–22 (11th Cir. 2018) (no "meeting of the minds" where drafter mailed a "purportedly court-evicting" amendment directly to a litigant it knew was "actively represented by counsel as to the very issues raised in the amendment"); *Russell v. Citigroup, Inc.*, 748 F.3d 677, 680–81 (6th Cir. 2014) (declining to read an updated arbitration agreement to reach a pending suit and noting counsel's role under Model Rules of Professional Conduct 4.2). And one court in this District, addressing the same tactic, put it bluntly: soliciting a represented adversary to surrender her dispute-resolution rights is "a poor (if not unethical) practice," and "fundamentally and manifestly unfair, and contrary to public policy." *Grant v. T-Mobile USA, Inc.*, No. 2:23-cv-01946-MJP, 2024 WL 3510937, at *6 (W.D. Wash. July 23, 2024) (quoting

*Wilcox v. Valero Ref. Co.*, 256 F. Supp. 2d 687, 691–92 (S.D. Tex. 2003)).[8] The manner of solicitation does not, by itself, decide the question. But it is of a piece with everything else about this amendment, and it deepens rather than dispels the procedural concern.[9]

These circumstances share a common root. An adhesive contract offered on Valve's terms, a rejection mechanism that made saying no ruinous, and a solicitation that ran around the consumers' own lawyers all reflect the same imbalance of power between Valve and its individual users. Taken together, they establish that the retroactive forum clause was likely procedurally unconscionable as applied to these Defendants.

#### 3.3.3 The Updated SSA is likely substantively unconscionable as applied to Defendants.

Substantive unconscionability asks whether a term is so "'one-sided or overly harsh'" that it should not be enforced. *Adler*, 103 P.3d at 781 (quoting *Schroeder v.*

---

[8] *Grant* did not reach the question of whether this practice was unconscionable under Washington law because the parties' delegated the issue to the arbitrator. 2024 WL 3510937, at *7. Because the Updated SSA does not contain a delegation clause, Court has no such impediment in determining the unconscionability of the agreement.

[9] Valve's supplemental authority, *SCPS LLC v. Kind Law*, No. CV 25-3255-MWF (SSCx), 2026 WL 96898 (C.D. Cal. Jan. 8, 2026) (submitted at Dkt. No. 130), distinguished *Dasher* and *Russell* on the ground that those cases "look[ed] to other indicia of intent" only because the amendments were ambiguous about reaching pending disputes, whereas the modification there was "quite explicit" that it applied to pending claims. *Id.* at *9–10. That distinction goes to contract formation. The Court has found that Defendants likely assented to the Updated SSA, so as observed here, the around-counsel solicitation bears not on whether they assented but on whether the manner of obtaining that assent was procedurally fair.

*Fageol Motors, Inc.*, 544 P.2d 20 (Wash. 1975)). "'Shocking to the conscience,' 'monstrously harsh,' and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability." *Id.* (quoting *Nelson v. McGoldrick*, 896 P.2d 1258 (Wash. 1995)). "Coupled with the substantive component is an assessment of the term's unconscionability where [courts] consider the unfairness of the contract term or result." *Tadych*, 519 P.3d at 203. Drawing the two together, the court has held a term unconscionable where it "eliminates otherwise established statutory rights and is one sided, benefiting the contract drafter, … is not negotiated or bargained for, and provides no benefit to the affected party." *Id.* at 204. All marks are met here.

Look first at what the clause does. Applied to Defendants, it terminates arbitrations they had already filed, unwinds the work and expense those proceedings demanded, and—for those nearest a final award or with an award in hand—threatens the awards themselves. Only one side loses anything of value in the trade. Defendants surrender a forum they invoked, paid counsel to use, and in some instances litigated to the brink of judgment or past it. Valve is relieved of the cost of defending arbitrations whose fees it had agreed to bear. Losing an accrued right is not the same as shedding a cost one undertook to pay, and a term that does the first to the consumer while doing the second for the drafter is one-sided in operation, whatever its surface symmetry. *See Tadych*, 519 P.3d at 203–04.

The clause also cuts into statutory rights, and there the harm runs deeper than relocation. Defendants' antitrust and consumer-protection claims carry limitations periods, and they filed those claims in arbitration beginning October 2,

2023. *See* Dkt. No. 81 ¶¶ 4–5. If the arbitrations are halted and claims refiled in court, some may be time-barred unless tolling preserves them—a question that is contested and unsettled. At oral argument, Valve's counsel represented that claimants who reach a final merits award in arbitration are "out," with no tolling, while those who stop short would be tolled from the *Wolfire* filing. Taken at face value, that proposition confirms the hazard rather than dispelling it—an injunction would force Defendants to refile and stake their accrued claims on an unresolved tolling question, with no assurance of survival for those whose arbitrations have reached or neared an award. Washington courts have repeatedly declined to enforce terms that curtail the ability to vindicate statutory rights. *See Adler*, 103 P.3d at 787–88 (180-day limitation on statutory discrimination claims substantively unconscionable because it gave the drafter "unfair advantages"); *Gandee v. LDL Freedom Enters., Inc.*, 293 P.3d 1197, 1200–02 (Wash. 2013) (provision shortening the limitations period from four years to thirty days substantively unconscionable). A term that does not merely shorten the time to sue but threatens to extinguish accrued claims outright is more harsh, not less.

Valve's contrary arguments do not hold up. It first says the clause is even-handed because the Updated SSA sends both sides to court and exempts no one. But facial symmetry does not answer the question *Tadych* poses, which asks how the term operates on the affected party. 519 P.3d at 203–04; *see also Adler*, 103 P.3d at 786–87. Both sides may now litigate in court, yet only Defendants lose something of value by the move. Valve next casts the amendment as a gift to consumers since it removed the class-action waiver and opened a judicial forum. For a future claimant

who has not yet chosen a forum, that may well be a benefit. But Defendants are not future claimants. They already elected arbitration, brought individual claims, and pursued them to the verge of relief. The value gained—or, perhaps more accurately, regained—by the restored class mechanism and ability to present their claims against Valve to a jury is worthless, and “access to court” is not an opening but a forced exit from a forum where they were already proceeding, and in some cases prevailing. The argument also proves too much. The access to court and class procedure Valve now touts as a gift are the very things its old arbitration clause and class waiver took away—the provisions it is only now repealing—after Valve forced Defendants to litigate without them. A party cannot strip a right, compel its adversaries to proceed without it, and then claim credit for handing it back on the condition that they abandon what they have already built. *Tadych* forecloses that move by measuring benefit from the affected party’s side, not the drafter’s. 519 P.3d at 204.

The disparity in bargaining power confirms the conclusion. Substantive unconscionability also considers “the expertise or sophistication of the parties, which party drafted the contract, and whether the term at issue was separately negotiated or bargained for.” *Tadych*, 519 P.3d at 204. Valve is a multibillion-dollar platform represented by sophisticated counsel, and the Defendants are individual consumers who bought video games. Valve drafted every word of the SSA, original and amended alike. No terms were negotiated, and no consumer had any say. A retroactive, forum-stripping provision imposed on those terms, the burden of which falls entirely on the side with no part in writing it, is one-sided and overly harsh.

The retroactive forum clause is likely substantively unconscionable as applied to Defendants. Combined with the procedural unconscionability discussed above, it is unenforceable, and Valve is thus unlikely to succeed on the merits.

#### 3.3.4 The Court does not reach Defendants' waiver and estoppel arguments.

Defendants advance two further grounds for denying the injunction. Dkt. No. 92 at 31–35. They contend that Valve waived any right to halt these arbitrations by compelling them and then litigating in that forum for more than a year. And they argue that equitable and judicial estoppel bar Valve from reversing the position it took when it moved to send these very claims to arbitration. The Court does not reach either argument. Having concluded that Valve is unlikely to succeed on the merits because the retroactive forum clause is unenforceable as applied to Defendants, the Court has resolved the likelihood-of-success inquiry on the ground that most directly disposes of it. Whether waiver or estoppel would independently bar the relief Valve seeks is a question the Court need not answer, and it expresses no view on it. Nothing in this Order forecloses Defendants from pressing these arguments as the case proceeds.

### 3.4 The remaining *Winter* factors do not save the motion.

Because Valve has not shown a likelihood of success on the merits, the Court need not analyze the remaining *Winter* factors. *See Garcia*, 786 F.3d at 740 (likelihood of success is "the most important" factor, and a failure to show it ordinarily ends the inquiry). Even so, the Court addresses them briefly, because each points the same way.

Take irreparable harm first. Valve says being "forced to arbitrate a dispute it did not agree to arbitrate" is per se irreparable harm. Dkt. No. 79 at 24 (quoting *Oppenheimer & Co. v. Mitchell*, No. C23-67 MJP, 2023 WL 2428404, at *6 (W.D. Wash. Mar. 9, 2023)). But that general rule speaks to a stranger to the forum—a party that never agreed to arbitrate, or that lost the right. Valve is the opposite. It wrote the arbitration clause, compelled thousands of consumers into the forum under it, and litigated there for more than a year before deciding it preferred court. The only injury Valve identifies in continuing is the time and money of doing so—and an injury that money can repair is, by definition, not irreparable. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended" are not irreparable). Valve points to no loss a damages award could not undo, only the ordinary expense of a forum it chose. And it is not without recourse. Participating under a reservation of rights, Valve may oppose confirmation and seek vacatur of any award on the grounds the FAA allows. A cost a party elects to incur, and that money could repay, is not the irreparable harm that warrants an extraordinary remedy. *See Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury.").

The balance of equities and the public interest, which overlap substantially on these facts, point the same way. An injunction would fall hard on the Defendants: by the time of argument, some had prevailed on liability or completed their merits hearings, and arbitrators had begun entering awards in their favor. An injunction would erase that work and, if Valve's tolling position prevails, push hard-

won claims toward expiration. Against that, Valve faces only the burden of the forum it chose. That is not an equity that favors relief.

Valve casts the arbitrations in a different light. It describes them as a lawyer-driven scheme—an effort to "weaponize" the arbitration clause and extract a settlement through mass arbitration,[10] prosecuted on behalf of claimants who, Valve says, sometimes did not know a claim had been filed for them. On that telling, the arbitrations are vexatious and oppressive, and equity should end them.[11] The argument founders on a fact Valve cannot escape—the mass arbitration is Valve's own design at work. Valve wrote a contract that barred class actions and channeled every dispute into individual arbitration. Thousands of individual arbitrations are what that contract produced. The Washington Court of Appeals said exactly this in Valve's failed suit against the Defendants' counsel, holding that "the filing of thousands of individual arbitration requests . . . is a direct result of [Valve's] own agreement barring class actions and prohibiting collective or representative arbitration," and adding that on this issue, "Valve is hoist by its own contractual petard." *Valve Corp. v. Bucher Law PLLC*, 571 P.3d 312, 321 n.6 (Wash.

---

[10] A relatively recent development, mass arbitration is when a single firm or group of firms "amass thousands of clients who have allegedly suffered a common harm by a common defendant," and then "file hundreds or thousands of individual arbitration demands . . . with the stated intent of arbitrating each individual case until a satisfactory aggregate settlement is reached." J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1322 (2022).

[11] Valve draws "vexatious or oppressive" from *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012), but that phrase, as used, is one of the *Unterweser* factors used when considering a foreign anti-suit injunction as a matter of international comity. It has no bearing on domestic arbitration.

Ct. App. 2025). A party cannot build a contract that funnels every claim into individual arbitration and then call the arbitrations an abuse when they arrive in number.

To the extent Valve presses misconduct by opposing counsel—claims filed without authority, or for those who could not bring them—that is a matter for the arbitrators and the bar, not for this Court sitting in equity. The Washington appellate court also rejected Valve's argument that no one could discipline such conduct, explaining that "some power to discipline" is available through the individual arbitrators and through professional-responsibility channels. *Id.* at 321–22. The AAA's rules supply sanctions, fee-shifting, and dismissal, and the arbitrators in this record have used them on both sides. They have sanctioned Defendants' counsel for filings the arbitrator described as "willful" and "shocking" misconduct, Dkt. No. 81 ¶¶ 34–38, and they have found Valve "engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof," Dkt. No. 88-2 at 4. That is the arbitral forum doing the work entrusted to it. Equity does not enlist this Court as a super-arbitrator to override the rulings of the forum Valve invoked because Valve now prefers a different one.

The public interest points the same way, for two reasons that look beyond this case. The first is the FAA's principle that arbitration agreements stand on "same footing" with other contracts. *Morgan v. Sundance, Inc.,* 596 U.S. 411, 418 (2022). Equal footing runs both ways—the policy that lets a party compel arbitration is not a one-way ratchet that also lets the drafter abandon arbitration once its chosen field becomes muddy. *See In re Sussex*, 781 F.3d 1065, 1073 (9th Cir.

2015). The second is the prospect of serial forum-switching. Asked at argument what would stop Valve from amending the SSA again—"a third time, a fourth time, a fifth time, going back and forth between federal court and arbitration"—counsel offered no limiting principle, answering only that the parties had agreed to whatever the contract said and that this was "bilateral contract land." But calling a consumer's click on a single "Agree" button "bilateral" does not make the bargaining power behind it equal. A rule that lets the party holding the pen move the forum back and forth, according to which forum has treated it better lately, is not mutual consent—it is the drafter's prerogative dressed up as agreement. The public interest lies in finality, not in that.

## 4. CONCLUSION

A preliminary injunction is an extraordinary remedy, and the burden of justifying one rested on Valve. Valve has not met that burden. It has not shown a likelihood of success on the merits because the retroactive forum clause it drafted is unconscionable as applied to Defendants and is thus unlikely to be enforced. The remaining *Winter* factors do not change the result. The motion fails.

Valve's Motion for a Preliminary Injunction, Dkt. No. 79, is DENIED.

The Court also DENIES Defendants' motion to file supplemental briefing. Dkt. No. 125. Having reviewed the motion, Valve's response, Dkt. No. 126, and the reply, Dkt. No. 128, the Court finds that while the information contained within the supplemental brief post-dates the briefing in this case, the arguments raised and

facts presented by the Certain Defendants do not weigh on the Court's analysis on the merits.

Dated this 27th day of May, 2026.

Jamal N. Whitehead
United States District Judge